**IN THE COURT OF APPEALS OF IOWA**

No. 15-2013
Filed October 12, 2016

**JAMES SCOTT MUNSON,**
        Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
        Respondent-Appellee.
_____

Appeal from the Iowa District Court for Woodbury County, Jeffrey L. Poulson, Judge.

James Scott Munson appeals the denial of his application for postconviction relief. **AFFIRMED.**

Rees Conrad Douglas, Sioux City, for appellant.

Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee State.

Considered by Danilson, C.J., and Mullins and Bower, JJ.

**DANILSON, Chief Judge.**

James Scott Munson appeals the denial of his application for postconviction relief. Finding no reason to disagree with the district court's conclusion that trial counsel's performance was not constitutionally deficient, we affirm.

**I. Background Facts and Proceedings.**

Following a jury trial, Munson was found guilty of third-degree sexual abuse and lascivious acts with a child based primarily on the victim's testimony concerning sex acts occurring between April 1, 2010, and May 20, 2011, when the victim was twelve and thirteen years of age. At the time of trial, the victim was fourteen, and Munson was forty-nine years old. Our opinion affirming the criminal convictions summarizes:

> The victim testified as to encounters with Munson, which included oral sex and the use of his fingers, penis, vibrators, a cucumber, and a K–Y Jelly bottle to penetrate her vaginally. She also testified that he played with her breasts.
> When the victim was younger her mother had frequently asked Munson to babysit her. The victim continued to visit Munson in his home and occasionally in her home as she grew older. The victim found some of her mother's sex toys and asked Munson about them. Munson told the victim's mother about her discovery. The mother ordered the victim not to use the sex toys. Munson's sexual encounters with the victim began at about the time of the discussion between Munson and the victim's mother.
> The State's case was primarily based on the victim's testimony, which was extensive, explicit, and detailed. Munson admitted to the victim's mother when confronted, and to law enforcement when interviewed, that he had purchased the K–Y Jelly and had given it to the victim. Otherwise, he denied the sexual encounters with the victim.
> . . . .
> There was little direct evidence to corroborate the victim's testimony, but it was consistent with surrounding events as to time and contact with Munson. There was no contention that the

victim's statements to her mother or the interviewing officers were inconsistent with her testimony at trial. Munson did not testify.

*State v. Munson*, No. 13-1150, 2014 WL 2884874, at *1 (Iowa Ct. App. June 25, 2014).

Munson sought postconviction relief (PCR) alleging trial counsel had provided ineffective assistance. He argued that in this "he said, she said" case, "much more could have been presented through collateral witnesses to bolster the defense of impossibility and to discredit the 'she said' testimony of [the victim]." Munson asserted his trial counsel, Sherese Manker, did not present any evidence that Munson's weight from 2002 to 2004 (when he was involved with the victim's mother) was considerably less than it was in 2011 (suggesting his weight gain affected his ability to have sex with the victim). He argued the jury at his criminal trial thus received no reason to believe sex was possible for Munson in 2003 but not 2011. Munson also complained trial counsel did not present evidence to rebut the victim's testimony that Munson had put boxes in the hallway of his brother's doorway to alert him if his brother was up. Munson also maintained Manker was ineffective in not presenting evidence that a "swing" or lift, which was used to move his mother and which the victim claimed was used during a sex act was broken.

At the postconviction trial, Steven Munson, the defendant's brother, testified he lived in the residence with Munson and their mother during all times relevant to the sexual abuse charges. He stated their father had died on May 30, 2010, and their mother had congestive heart failure and diabetes and was unable to walk as of 2009. Steven testified that he and Munson were caretakers for their

mother. He stated the lift used to move their mother was broken on the left side and "it was just like it was kind of weak there" and they were not able to use it "as much." He stated the doors to the bedrooms of the house opened inward. Steven stated he thought Munson "weighed probably right around 350" pounds in 2011. When asked if Munson had any physical problems besides obesity in 2011, Steven responded, "Not that I'm aware of."

Munson's friend, Karen Ramos, testified if she had been called as a witness at Munson's criminal trial she would have testified that on Friday evening, May 20, 2011, (the date the victim testified was the last incident of sexual abuse) she was on the phone with Munson for approximately two hours beginning at approximately 6:30 p.m. The victim answered the phone and then gave the phone to Munson. She stated she could hear the child playing in the background while she and Munson spoke on the phone.

Munson's sister, Patty Marsh, testified the victim's mother stated to Marsh in the spring of 2010 that the mother had just hosted a "passion party" (selling sex toys and aids) and that she was going to buy her child a sex toy "to teach her that she didn't need a man to take care of herself sexually." Marsh also stated that Munson had permission to speak with the child concerning sexual issues "because he was like a father figure" and the mother wanted to be informed by Munson about any questions the child had concerning sexual issues. Marsh testified further that she was familiar with Munson's residence, and that on May 20, 2011, Munson lived with his mother and their brother, Steven Munson. Marsh testified the bedroom doors in the house opened inward. Marsh testified one side of the hoist or swing used to assist in moving her mother was

"unhooked" and "it just wouldn't hold her." Marsh testified Munson weighed less when dating the victim's mother than in 2011. Marsh also testified the victim and Munson had a father-daughter relationship.

Debbie Williams testified she had known Munson for many years, knew he had dated the victim's mother "a long time ago," stated they maintained a close friendship even after they stopped dating, and knew that Munson weighed about 350 pounds when dating the child's mother and 550 pounds in 2011. Williams testified she was present during the conversation when the victim's mother told Munson he had permission to speak about sexual matters with the child. She also testified she was familiar with Munson's residence, confirming that bedroom doors opened inward. She, too, stated Munson and the child had a father-daughter relationship.

Manker testified about her preparation for trial, including that she had a number of meetings with Munson and Marsh in which they talked about the impossibility defense, the victim's relationship with Munson, the layout of the Munson residence, the victim's mother's new boyfriend, and potential witnesses. Manker subpoenaed the child's school records; obtained Munson's medical records; deposed the child and her mother; directed her investigator to gather information about "passion parties" and certain types of sex toys, both of which came up during the depositions; obtained photographs of the sex toys mentioned by the child and her mother and purchased wooden dowels to replicate their size (circumference); photographed Munson without any pants on to show his state of obesity; and checked into possible witnesses for trial.

Manker testified that during the criminal trial, she cross-examined witnesses and offered photographs of Munson. Manker had argued Munson was so obese that it was physically impossible for him to commit the sex acts as alleged. Manker even had Munson demonstrate for the jury how it was impossible for him to commit the sex acts by having him get down on the floor on his back and then attempt to get back up. She also had him demonstrate that he was not able to bounce a child on his lap, as had been alleged, and she had Munson demonstrate how he could not reach his private area. She was able during questioning of witnesses to elicit testimony that repeated penetrations by various objects as alleged by the victim would result in injury, and no injury was observed during the victim's medical exam. She also was able to challenge the victim's credibility. Manker testified she discussed trial strategy with Munson "every step of the way."

Manker stated testimony from Munson's friends and family was character evidence, which was neither relevant nor admissible. She testified that she did not call Steven to address the issue of whether Steven's bedroom door swings in or out because it made no difference—boxes could still be set outside of the door to act as an alarm to alert Munson while Munson and the child were in the living room. Manker testified that she did not present any evidence of the hoist because she was never made aware of it by Munson or anyone else; and even if it was broken, neither Marsh nor Williams could testify when it actually broke, and Marsh testified that they "weren't able to use it as much," not that it could not be used at all.

The PCR court dismissed Munson's PCR application, concluding trial counsel had made reasonable strategic decisions. The court found Manker presented sufficient evidence to support the defense of impossibility and the fact that she did not present evidence concerning Munson's weight gain, that is, that she "did not present evidence to rebut one specific State assertion does not fall to the level of incompetence." Moreover, Munson's weight gain was testified to by Debbie Williams, and Munson was able to give a floor demonstration of his capabilities or lack thereof. The testimony of other witnesses about Munson's weight gain would have been cumulative evidence.

With regard to the direction the doors opened, the PCR court ruled, "Manker's determination regarding the box evidence is clearly a tactical decision made after a thorough investigation of the particular facts." Further, according to the victim, no sexual activity occurred on this day so the direction the doors opened was not significant.

In regard to the broken swing or lift that was used to help get Munson's mother out of bed, and in which the victim asserted she had climbed into and Munson then performed sex acts on her, the court found:

> Manker testified that she was unaware that the swing was broken. She met with both [Munson] and Patty Marsh several times over the course of the trial, and neither informed her of this fact. Without being told this, Manker had no opportunity to investigate the claim or present evidence in this regard. Additionally, at the present trial, Steve Munson did not specify that the lift was broken when the alleged acts occurred; only that it was broken after 2011. Patty Marsh stated that it was broken prior to 2011, but went on to describe an instance after the lift allegedly broke that she had used it to help her mother.

The PCR court concluded, "Manker cannot be held ineffective for not investigating and presenting evidence about which she had no way of knowing."

The PCR court also addressed Munson's complaint that Manker failed to properly characterize the nature of the relationship between Munson and the victim[1]:

> [Munson's] insistence on the relationship being described as that of a father/daughter is for the purposes of showing that the relationship was more personal than just casual friendship. Manker entered evidence to show, through testimony, that [Munson] "would do anything to make [the child] happy." The distinction between the two interpretations is so subtle that it cannot be said that the use of one or the other would have had any effect on the jury's verdict.

Finally, the PCR court observed that with respect to Ramos' testimony about the phone call, Manker was aware of the phone call but did not call Ramos to testify for legitimate reasons, i.e., Ramos was not physically present at the residence and, therefore, could not testify as to what actually went on, and the phone call did not last the entire length of the child's visit at Munson's residence. The court found this a reasonable strategic decision.

Munson appeals.

**II. Scope and Standard of Review.**

An appeal from the denial of a PCR application is ordinarily reviewed for errors of law. *Nguyen v. State*, 878 N.W.2d 744, 750 (Iowa 2016). However, claims of ineffective assistance of counsel are grounded on constitutional guarantees and are thus reviewed de novo. *Id.*

---

[1] At trial, the State had described their relationship as "buddies." Munson wanted to show that the relationship was more like a father and a daughter.

**III. Analysis.**

To establish a claim of ineffective assistance of counsel, an applicant must show (1) the attorney failed to perform an essential duty, and (2) prejudice resulted to the extent it denied the applicant a fair trial. *Id.* at 752. Upon our de novo review, we conclude Munson has failed to meet his burden of proving both elements. *See id.*

We have little to add to the PCR court's reasoning. Munson has not shown how the evidence he presented at the PCR trial likely would have changed the result of his criminal trial. The victim's testimony was challenged through cross-examination and physical demonstrations by Munson. Trial counsel attempted to address Munson's close relationship with the child and his statement to police that he had several conversations about sex with the child and had purchased K-Y Jelly for her. "A defendant is not entitled to perfect representation, rather representation which is within the normal range of competency." *State v. Artzer*, 609 N.W.2d 526, 531 (Iowa 2000). Here, trial counsel's strategy and representation were within the normal range of competency and counsel was not ineffective. We affirm.

**AFFIRMED.**